## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

UNITED STATES OF AMERICA,      )
                               )
Plaintiff,                     )
                               )
vs.                            )        No. 2:15-CR-79
                               )
DAVID WATSON,                  )
                               )
Defendant.                     )


## OPINION AND ORDER

This matter is before the Court on the Motion to Suppress Evidence, filed by Defendant, David Watson, on November 20, 2015. (DE #19). For the reasons set forth below, the motion is **DENIED**.


BACKGROUND

Defendant, David Watson ("Watson"), is charged with being a felon in possession of a firearm, in violation of 18 U.S.C. section 922(g). Watson has moved to suppress all evidence seized or derived from his seizure on July 5, 2015, claiming violations of his Fourth Amendment rights. In his motion, Watson claims that his seizure was based on an uncorroborated anonymous tip which, under the circumstances, was insufficient to justify the seizure.

This Court held an evidentiary hearing on the matter on January 11, 2016, at which Officers Anthony Boleware ("Officer Boleware") and Wayne Dodson ("Officer Dodson"), of the Gary Police

Department, testified.  At the conclusion of the hearing, the Court took the instant motion under advisement and ordered that the parties submit additional briefing to the Court.

FINDINGS OF FACT

In making the following findings of fact, the Court has considered the briefs of the parties, the evidence presented, and the credibility of the witnesses.  Therefore, the Court finds as follows:

On July 5, 2015, at 9:34 a.m., the following exchange took place over the Gary Police Department's 911 dispatch system:

**911 Operator:**  Gary 911

**Caller:**  Hello. I'm calling [inaudible] 1832 West 5th Avenue they's, uh, boys [inaudible] parking lot playing with guns and stuff.

**911 Operator:**  1832 West what?

**Caller:**  5th Avenue.

**911 Operator:**  And there's boys in the parking lot playing with guns?

**Caller:**  Yes and they, uh, but they standing there, it's a grey and greenish Charger, they standing there, everybody just out there playing with they guns [inaudible].

**911 Operator:**  Gray and green charger?

**Caller:**  Yes.

**911 Operator:**  How old are you?

**Caller:**  14

**911 Operator:** Is your parents there?

**Caller:** Um, No.

**911 Operator:** Do you live in the building?

**Caller:** No. I'm, I was at my friend's house but they wasn't here and I left.

**911 Operator:** You at your friend house, your friend parents there?

**Caller:** Um, no, I say, I was at their door, there wasn't nobody there, so I left, but—

**911 Operator:** Do you know how many it is?

**Caller:** Uh, it's about 4 or 5, I think 5 of em.

**911 Operator:** You think it's 5 of em?

**Caller:** Yes, but I know it's more than 4, [inaudible] 5.

**911 Operator:** Are they Black, White, Hispanic?

**Caller:** They Black.

**911 Operator:** In the alley?

**Caller:** Um, in the parking lot across [inaudible].

**911 Operator:** They where?

**Caller:** In the parking lot across the street from McDonalds.

**911 Operator:** In the parking lot across the street from McDonalds?

**Caller:** Yes. Hello?

**911 Operator:** I'm here, I'm just typing it in.

**Caller:** Yes.

**911 Operator:** And you said the Charger is gray and green?

**Caller:** Yes, it's like, yeah, it's gray and green put together.

**911 Operator:** So you saw 'em playing with a gun?

**Caller:** Yes.

**911 Operator:** Did you happen to see how many weapons there was?

**Caller:** Um, I know I seen 2, but I don't know if the other 2 had guns, but I know I seen 2 of em.

**911 Operator:** Are you still in the building?

**Caller:** Um, I'm, I'm in McDonalds.

**911 Operator:** You in McDonalds?

**Caller:** Yes.

**911 Operator:** And your number is 433-2077?

**Caller:** Yes. No, no, no, no, no. This is um, this man's phone. Um, I don't have a phone uh, but, I can try to stay close to the man's phone [inaudible].

**911 Operator:** OK.

**Caller:** All right.

**911 Operator:** Bye.

(Gov. Hrg. Ex. 1; Def.'s Ex. A).

As a result of that call, the following call was sent from dispatch at 9:42 and received by Officer Boleware:

**911 Operator:** 1292, 1362, Gary

**Boleware:** [inaudible] Go

**911 Operator:** Have a man with a gun 1532 West Fifth Avenue. 1-5-3-2 West Fifth Avenue. Have five male blacks in the parking lot across from McDonald's in a green—check that, a gray and green Charger displaying weapons. 1-5-3-2 West Fifth Avenue [inaudible].

**Boleware:** 13. Copy. 15th and uh [inaudible] … you said a gray and green Charger?

**911 Operator:** Affirmative.

(Gov. Hrg. Ex. 1).

Officer Boleware has been working for the Gary Police Department for 18 years, and he has been a patrolman for

-4-

about eight years. (Tr. 5-6). As a patrolman, he is in charge of patrolling the midtown sector of Gary. (Tr. 6). Officer Boleware was doing that on the morning of July 5, 2015. (Tr. 6). At the hearing on the motion to suppress, Officer Boleware testified that he received a call from the Police Department's dispatcher indicating — as he remembered it — that there were "either four or five guys in a Charger, I think it was a gray or green Charger, at 1532 West 5th Avenue in the parking lot pointing guns at people."[1] (Tr. 8). When Officer Boleware heard the call, what stuck out to him was the address. (Tr. 9). He knows this address to be in a high-crime area. (Tr. 9). Officer Boleware said it was the type of call he would take seriously and contained a sense of urgency because "[i]f it was described like three or four guys displaying weapons, they might [be] about to shoot somebody or may be sitting there waiting for somebody to come out so they could shoot them. It may be a shooting about to go down." (Tr. 9-10).

Officer Boleware drove his car to the location and, at 9:46 a.m., pulled into the parking lot through an alley. (Tr.

---

[1] This recollection is inaccurate. Neither the 911 caller nor the dispatch call indicated that guns were being pointed at people. Furthermore, the dispatch employee failed to indicate that the individuals were described by the caller as being in the parking lot, not the vehicle.

10). There were seven vehicles in the parking lot, but it was clear which car dispatch was referring to, and Officer Boleware saw "about four guys sitting in it." (Tr. 10-11, 27). He did not see any other Chargers in the area, and "that was the only car that had four people in the car." (Tr. 11).

Officer Boleware parked perpendicular to the Charger, blocking it in, because he wanted to make sure they did not drive away. (Tr. 11). Officer Boleware asked the individuals multiple times if they had any weapons, and all four denied there were weapons in the car. (Tr. 29). Officer Boleware asked the driver for identification, and he produced a valid driver's license. (Tr. 29).

At 9:47 a.m., Gary Police Officer Stiles ("Officer Stiles") arrived at the scene. After Officer Stiles showed up, the officers called for further backup because they were outnumbered. (Tr. 12). Officer Boleware continued to interrogate the occupants regarding the presence of guns. (Tr. 41, Gov. Ex. 2).

Around 9:54, Gary Police Officer Mike Clark arrived. (Gov. Ex. 2). A few seconds later, Officer Dodson arrived.

Officer Dodson has worked for the Gary Police Department for 17 years, has been a patrolman for the past nine, and was out patrolling on July 5, 2015. (Tr. 47-48). Like Officer Boleware,

Officer Dodson testified that the location was "known to be a hot area." (Tr. 48). Officer Dodson testified that the call was one he would take seriously and there was an urgency to it because "[a]ny time you have males with weapons, there's always a sense of urgency 'cause anything could happen." (Tr. 49).

Officer Dodson was the last of four officers to respond and, upon arrival, he saw a car fitting dispatch's description. He noted that "it was the only gray Charger in the parking lot and it was occupied." (Tr. 50).

An officer was positioned at each of the doors of the car. Officer Boleware was at the back door on the passenger's side, Officer Dodson was at the front door on the passenger's side, Officer Clark was at the driver's side front door, and Officer Stiles was by the back door on the driver's side. (Tr. 13). The officers planned on pulling the occupants out of the car one-by-one, but when the officers told the front-seat passenger — Watson — to get out, Watson turned his back to the door with his face looking toward the officer and threw a gun over the seat and into the back.[2] (Tr. 13-14). It

---

[2] On cross-examination, Officer Boleware clarified as follows:
Q: Okay. So it's your testimony that the gun was thrown before he was taken out of the vehicle?
A: The gun was thrown while he's trying - - he's trying to get out the vehicle. He's coming out the vehicle,

landed at the feet of one of the rear passengers. (Tr. 13-14). Officer Dodson heard Officer Boleware say: "[h]e threw a gun, get the passenger out of the car, and that's what [Officer Dodson] did." (Tr. 51). Officer Boleware then recovered the gun, and, in the process, found another gun in the pouch behind the front-seat passenger's seat. (Tr. 15-16).[3]

CONCLUSIONS OF LAW

The Fourth Amendment protects persons from unreasonable searches and seizures, and this protection has been extended to the states through the Fourteenth Amendment to the United States Constitution. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961); U.S. Const. Amend. IV. The Fourth Amendment prohibits a warrantless search, unless the search falls under one of the recognized exceptions to the warrant requirement. *U.S. v. Denney*, 771 F.2d 318, 320 (7th

---

and right when he's coming out, he do this (indicating). He's backing out the vehicle, and he throw it over his back. And it went over the top of the chair and landed back there in the back of him where the other guy was sitting at.
(Tr. 40).

[3] Watson's attorney argues that Officer Dodson had not yet reached the car when Officer Boleware began searching and patting down the passenger seated on the rear of the passenger's side of the vehicle. The Court has reviewed both angles of available video footage, and in each of them, the Charger is in a shadowy area, making it difficult to determine the precise moment when Officer Boleware began patting down the rear passenger. There is no evidence other than the video, which is inconclusive at best, to support Watson's version of the events. This factual disagreement, however, is immaterial to the outcome of the instant motion.

Cir. 1985). If a search is conducted without a warrant, the Government bears the burden of proving by a preponderance of the evidence that an exception to the warrant requirement existed at the time of the search. *United States v. Taylor*, 776 F.3d 513, 518 (7th Cir. 2015). Ultimately, the Fourth Amendment's touchstone is reasonableness. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). This Court has considered the evidence, the briefs, and the oral arguments of counsel and finds no violation of Watson's Fourth Amendment rights.

Probable cause is not necessary for police to conduct an investigatory stop, limited in scope and executed by reasonable means. *Terry v. Ohio,* 392 U.S. 1, 18-20 (1968). To make an investigatory stop, an officer needs only reasonable suspicion supported by articulable facts that criminal activity may be afoot. *Id.; United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002). Reasonable suspicion is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Jackson*, 300 F.3d at 745 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

The reasonableness of a *Terry* stop is evaluated by looking at whether the officers' actions were justified at the inception of the stop and whether the stop was reasonably related in scope to the circumstances that justified the stop in the first place. *Jackson*, 300 F.3d at 745 (citing *United States v. Swift*, 220 F.3d 502, 506

(7th Cir. 2000)).  The totality of circumstances known to the officers at the time of the stop must be considered in making this evaluation.  *Id.* (citing *Swift*, 220 F.3d at 506).  The totality of the circumstances includes the "experience of the law enforcement agent and the behavior and characteristics of the suspect."  *Id.* (quoting *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995)).

Here, the parties agree upon several things.  When Officer Boleware parked his car perpendicular to the Charger, it constituted a seizure for purposes of the Fourth Amendment.  Furthermore, the parties agree that the anonymous tip provided a sufficient basis for further police investigation.  Watson, however, contends that both the initial seizure and the subsequent frisk nonetheless violated the Fourth Amendment.  Watson argues that the stop violated the Fourth Amendment because the officers did not, at the time of the seizure, have reasonable suspicion to believe that criminal activity was afoot.  Furthermore, that the frisk violated the Fourth Amendment because the officers lacked reasonable suspicion that Watson was armed and dangerous.

The Initial Stop

An anonymous tip, standing alone, is seldom sufficient to justify an investigatory stop.  *Navarette v. California*, 134 S.Ct. 1683, 1688 (2014); *Alabama v. White*, 496 U.S. 325, 330 (1990).  But, "under appropriate circumstances, an anonymous tip can demonstrate

'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" *Navarette*, 134 S.Ct. at 1688 (quoting *White*, 496 U.S. at 327). The Supreme Court has addressed when anonymous tips can support reasonable suspicion on numerous occasions. *See White*, 496 U.S. at 325-33; *Florida v. J.L.*, 529 U.S. 266 (2000); *Navarette*, 134 S.Ct. at 1686-97.

In *Alabama v. White*, police received a detailed anonymous tip claiming that the defendant would leave a particular address at a particular time in a particular car with the right taillight lens broken, that she would go to a particular hotel, and that she would have a brown attaché case containing cocaine. 496 U.S. 325 (1990). Based on this tip, officers watched as the defendant proceeded exactly as the anonymous caller predicted. Just short of the hotel that the anonymous caller had described, the vehicle was pulled over. The Court found that the caller's ability to predict future behavior showed a special familiarity with the defendant and increased the likelihood that the caller also had information about the defendant's criminal activity. *Id.* at 332. Although described as a close case, the Court found that the stop was supported by reasonable suspicion. *Id.*

In *Florida v. J.L.*, however, the Court found that an anonymous tip was insufficient to support reasonable suspicion. 529 U.S. 266 (2000). In *J.L.*, police received an anonymous tip that a "young black man standing at a particular bus stop and wearing a plaid

shirt was carrying a gun." *Id.* at 268. The tip was not recorded
and nothing was known about the individual supplying the tip. Some
time later, and it is not clear how much later, officers were told
to respond. Upon arrival at the bus stop, there were three black
males, one of which was wearing a plaid shirt. Based on the tip
alone, the individual in the plaid shirt was stopped and frisked.
In finding that the officer lacked reasonable suspicion, the Court
noted that:

> An accurate description of a subject's readily
> observable location and appearance is of course
> reliable in the limited sense: It will help the
> police correctly identify the person whom the
> tipster means to accuse. Such a tip, however,
> does not show that the tipster has knowledge of
> concealed criminal activity. The reasonable
> suspicion here at issue requires that a tip be
> reliable in its assertion of illegality, not
> just in its tendency to identify a determinate
> person.

*Id.* at 272. The Court considered whether the fact that firearms
were involved justified the stop, but found that:

> [A]n automatic firearm exception to our
> established reliability analysis would rove too
> far. Such an exception would enable any person
> seeking to harass another to set in motion an
> intrusive, embarrassing police search of the
> targeted person simply by placing an anonymous
> call falsely reporting the target's unlawful
> carriage of a gun.

*Id.*

In *Navarette v. California*, the Supreme Court's most recent
case addressing anonymous tips, an individual called 911 and
reported that a Silver Ford 150 pickup with license plate number

8D94925 and headed southbound on Highway 1 had just ran her off the road. Several minutes later, an officer spotted the truck several miles further down the road and pulled the truck over. In determining whether the stop was supported by reasonable suspicion, the Court in *Navarette* looked to prior precedent, including *White*, and *J.L.*, and determined that, although it was a close case, the stop was supported by reasonable suspicion of drunk driving. *Navarette*, 134 S.Ct. at 1690-92. In making this decision, the Court considered several factors. *Id.* First, the Court found that the caller's account of what had occurred was sufficiently reliable for the officer to credit it because she was claiming eyewitness knowledge of what she reported. *Id.* at 1689. Furthermore, the caller's report was contemporaneous, and police were able to confirm the truth of some of what she reported – a truck meeting the description was found approximately 19 minutes after the report and located approximately 18 miles away from the mile marker indicated by the caller. *Id.* The Court also considered that the caller used the 911 emergency system – a system that makes calls traceable and would potentially subject the caller to prosecution for making a false report. *Id.* at 1689-90. Additionally, the Court determined that the report provided reasonable suspicion that the driver of the truck was engaged in ongoing criminal activity; namely, that the behavior reported by the anonymous caller provided reasonable suspicion of drunk driving. *Id.* at 1690.

The dissent in *Navarette* characterized the majority opinion as

-13-

a deviation from past precedent, but the majority does not claim to have altered the legal standard for determining when reasonable suspicion justifying an investigatory stop is present. *Id.* at 1692 (Scalia, J., dissenting). Accordingly, this Court will draw on *Navarette* as well as earlier Supreme Court cases in assessing whether the totality of the circumstances in this case support a finding of reasonable suspicion to justify an investigatory stop.

Here, like in *Navarette*, the caller claimed eyewitness knowledge of the reported activity. The operator specifically asked the caller, "So you saw 'em playing with a gun?" The caller responded in the affirmative. Also, the report was, like in *Navarette,* made contemporaneously. The caller used the present tense throughout the call. And, the caller used the 911 emergency system. Here, however, the caller claimed that he was not calling from his own phone. He reported that he had borrowed the cell phone of an unidentified man at the McDonald's across the street from the parking lot. And, the caller indicated he could try to stay close to the man's phone, suggesting a willingness to remain available if the police needed to contact him. The caller did not provide his name or address, but the operator never requested that the caller provide them. While this call was not directly traceable to a phone associated with the caller, unlike the call in *J.L.*, this call was recorded, and there was some possibility that the caller could be

identified and held accountable for a false report.[4]

Watson also points out that the dispatcher wrongly stated that the individuals were in the Charger, while the tipster said they were outside the Charger. The officers, however, were entitled to rely on the information provided by dispatch, even if erroneous. *See United States v. Mounts*, 248 F.3d 712, 715 (2001)("Whether or not the officers were given faulty (inaccurate) information ... is immaterial to the case because police officers are entitled to rely on the reasonable information relayed to them from a police dispatcher.")(citing *United States v. Hensley*, 469 U.S. 221, 231 (1985)).

Watson also points out that the caller did not provide any description of the individuals displaying weapons other than that they were black males. There were no descriptions of clothing or stature, for example. It would have been preferable if the caller had described more thoroughly the identity of the individuals who were displaying weapons. But, dispatch communicated that four or five black males were in a green and grey Charger in a parking lot at 1532 W. 5th Ave., and Officer Boleware arrived at the scene shortly thereafter to find a green and grey Charger containing four black individuals.

The description did not pinpoint which two of the four or five

---

[4] In fact, the Government was able to identify the caller following the hearing on the instant motion. (DE #39). This fact is irrelevant, however, as this Court's inquiry must focus on what was known by the officers at the time of the encounter. *See United States v. Hicks*, 531 F.3d 555, 558 (7th Cir. 2008).

men allegedly possessed the guns. *United States v. Williams*, 731 F.3d 678, 681 (2013), is instructive here. In *Williams*, a caller reported a group of 25 rowdy people with three or four displaying guns, but when officers arrived they found a much smaller group of people behaving appropriately. *Id.* Yet, the Seventh Circuit found the initial stop of the group of individuals lawful; although not the subsequent frisk. *Id.* at 683-90. Locating a group of four individuals, two of whom a caller has alleged possess guns, is very different than an allegation of three or four people in a group of 25, especially after many people left. At that point, the odds of one of the individuals who remained being the alleged possessor of the gun is negligible, yet the court in *Williams* thought it was enough to warrant an investigatory stop.

Under the circumstances before this Court, the information provided by the caller was reliable in the sense that it provided enough information for the police to identify the group of individuals whom the caller was accusing of displaying weapons. *See J.L.*, 529 U.S. at 272.

Watson also contends that the call did not provide reasonable suspicion to believe a crime may be afoot. In other words, the caller's allegations lacked reliability in the assertion of illegality, which is essential to justify the initial seizure. *Id.* In fact, Watson contends that an assertion of illegality is missing entirely. As Watson points out, in Indiana, it is not illegal to possess or even display a firearm in public. *See* I.C. § 35-47-2-1.

Gun rights have, indeed, been expanded in recent years, as Judge Hamilton noted in his concurring opinion in *Williams*, 731 F.3d at 694. And, if the Court considered *only* the information that dispatch provided, then there are considerably fewer facts on which to rest a finding of reasonable suspicion for the initial seizure. Dispatch indicated only that there were black males in the parking lot displaying weapons. These facts raise the same concerns as the facts in *J.L.* There is, after all, not an automatic firearms exception, and these facts may not suggest an ongoing emergency. *J.L.*, 529 U.S. at 272. Arguably, the situation is not so different than that in *Williams*, where the initial stop was deemed permissible, but this Court need not decide that issue.[5]

The Government, however, urges that the collective knowledge doctrine allows the knowledge of the 911 operator to be imputed to the officers. Under the collective knowledge doctrine, an officer may "stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010). Most often, the application of

---

[5] There are, of course, differences between the facts here and the facts in *Williams*. The call in *Williams* came in at night and the individuals were allegedly being loud in a bar parking lot, while the caller in the instant case called on a Sunday morning and reported nothing unruly about the group of men other than their display of weapons in a residential parking lot. This Court does not believe that any of these factual differences would tip the scales in Watson's favor on the issue of the initial seizure, although the issue need not be decided here.

the doctrine becomes important when one agency is investigating a crime and seeks the assistance of another agency in effectuating a stop or arrest. With regard to 911 operators, the Second Circuit Court of Appeals found that the doctrine did not apply to 911 operators because they lacked the training necessary to determine whether reasonable suspicion existed. *See United States v. Colon*, 250 F.3d 130, 137 (2d Cir. 2001). The Seventh Circuit Court of Appeals, however, has been critical of that decision. The court commented on the Second Circuit's position in *United States v. Whitaker*:

> One case in the Second Circuit expresses reservations concerning whether the collective knowledge doctrine should be extended to the 911 employee who takes the call and passes on the emergency nature of the situation to police officers operating in the field. *See United States v. Colon*, 250 F.3d 130 (2d Cir. 2001). The panel's misgivings in that case were based on the training given to employees who are not police officers. *Id.* at 135-37. Our case law, and indeed the case law of the other circuits, has not dwelled on the same reservations. In *Drake*, we held that 911 reports by identified callers can provide the police with reasonable suspicion and that 911 employees are part of the police collective. *Drake*, 456 F.3d at 775. Indeed, it appears that the Second Circuit has modified its position and would follow the path that we have chosen here in a case such as this where the callers were describing events of an emergency nature occurring as the individuals reported them. *See Anthony v. City of New York*, 339 F.3d 129, 136 (2d Cir. 2003)("In the instant case, the call came from the same location to which the police responded, and more importantly, the caller described an immediate and deadly threat of harm to which she herself was being exposed at that location. The concern we expressed in *Kerman* regarding

> the reliability of anonymous and uncorroborated
> calls - that is, calls reporting an emergency
> at a different location and involving someone
> other than the caller - is not implicated here,
> where the caller expressed an immediate risk of
> harm to herself, and where the address from
> which the call was placed was verified.").

546 F.3d 902, 911 n.12 (7th Cir. 2008). Watson has offered no argument on the subject of the collective knowledge doctrine.[6] Accordingly, this Court finds that, in this circuit, the collective knowledge doctrine can extend to 911 operators.

For the doctrine to apply, "(1) the officer taking the action must act in objective reliance on the information received, (2) the officer providing the information - or the agency for which he works - must have facts supporting the level of suspicion required, and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." *United States v. Williams*, 627 F.3d at 253 (citing *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992)).

One district court has interpreted the first requirement of the collective knowledge doctrine as requiring that the 911 operator either communicate the information or tell the officers to detain the suspect. *See Fernandez v. Rodriquez*, No. 09-CV-4297, 2012 WL 1565449, *3 n.2 (N.D. Ill. May 2, 2012)("[T]he collective knowledge doctrine is not in play because the dispatcher neither communicated

---

[6] In fairness, the Government raised this issue in response to Watson's post-hearing brief (DE #37). With seven briefs already on the record, counsel may have been hesitant to request an opportunity to file a sur-reply. Unfortunately, this leaves an important issue less than fully developed.

the information nor even simply told the officers to detain Fernandez.... As far as the officers knew, they were simply to respond to Fernandez's complaint and investigate it.")(citing *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992)).   However, when the Seventh Circuit Court of Appeals indicated a willingness to extend the doctrine to 911 operators, it is unlikely they envisioned a scenario where 911 operators would direct officers to stop, frisk, or arrest a suspect.   If information that is not actually communicated by a 911 officer can only be imputed to an officer when the dispatcher directs that the officer stop, frisk, or arrest a suspect, then the extension of the doctrine to 911 operators is nothing but a theoretical possibility.   This Court does not believe that is what the Seventh Circuit Court of Appeals in *Whitaker* imagined, and therefore, the knowledge of the 911 operator will be imputed to the officers in this case.

Although the caller did not say that the boys were pointing guns at anyone or otherwise misusing the guns, he did say that they were "playing" with them.   Furthermore, the caller used the term "boys," implying that the individuals with the guns might be minors. While the 911 operator did not relay all the details to the responding officers, both the caller and the dispatcher implied a need for dispatch.   "[A] need for dispatch can make reasonable a stop that would not be reasonable if the police had time to investigate at leisure." *United States v. Wooden*, 551 F.3d 647, 650 (7th Cir. 2008) (citing *United States v. Drake*, 456 F.3d 771, 775

(7th Cir. 2006) and *United States v. Hicks*, 531 F.3d 555, 558-59 (7th Cir. 2008)). While in this case, the need for dispatch was not quite as urgent as in other cases, "boys" that are "playing" with guns suggests a potentially dangerous and volatile situation sufficient to justify the initial seizure. *See Wooden,* 551 F.3d at 650 (need for dispatch where caller reported that a man with a gun was arguing with his girlfriend); *United States v. Washington*, No. 11-cr-40014-JPG, 2011 WL 5040949 (S.D. Ill. 2011)(noting the lack of a need for dispatch where the informant did not say that the suspect was brandishing or threatening to use the firearm).

Additionally, both Officer Boleware and Officer Dodson testified that the particular address referenced by the caller was a high-crime area.[7] While this alone cannot justify the seizure, it remains a relevant factor for consideration. *See United States v. Williams*, 731 F.3d 678, 687 (2013)("While we understand that the fact that a stop occurs in a high-crime area may be a factor under *Terry*, we believe that the rest of the case for a frisk, here, was so weak that this factor cannot save the frisk."); *United States v. Kenerson*, 585 F.3d 389, 392-93 (7th Cir. 2009)(noting that the high-crime area was one "bit" of information that contributed to a finding of reasonable suspicion).

Watson also points out that the caller in this case was a minor

---

[7] Watson argues that the Government should have put on more evidence to substantiate its claim that this is a high-crime area. Based on their experience and training, the officers' testimony is sufficiently reliable to support a finding that this is a high-crime area.

who represented that he was 14 years of age.  Watson asks this Court to place less weight on his claims because of his age, but this is not a child of four or ten – this is a teenager.  Watson has pointed to no case law that suggests the age of the boy who placed this 911 call (fourteen) should be viewed as detracting from the reliability of the allegations.  This Court declines to treat the caller's allegations as less reliable due to his age.

Lastly, Watson contends that the officers, instead of immediately seizing the vehicle's occupants, should have investigated further.  More specifically, Watson believes they should have parked the vehicle and observed to confirm the alleged facts.  That may have been a reasonable police response to the anonymous tip received, perhaps an even better response, but this Court is tasked with determining whether the actions taken comply with the Fourth Amendment, not identifying best police practices.  Here, the Government has demonstrated by a preponderance of the evidence that the officers had reasonable suspicion to make an investigatory stop without the additional observation urged by Watson.


<u>The Frisk</u>

Watson argues that the frisk also violated his Fourth Amendment rights.  A frisk may not be warranted even where an investigatory stop is warranted under *Terry* – it requires "some articulable suspicion that the subject is 'armed and dangerous.'"  *United States*

*v. Williams*, 731 F.3d 678, 686 (2013)(citations omitted).  Watson notes that, "[e]ven in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Williams*, 731 F.3d at 687 (citing *Maryland v. Buie*, 494 U.S. 325, 342 n. 2 (1990)).  Furthermore, "given the more burdensome intrusion of a frisk, such action should only be allowed when the officer can point to articulable facts that would establish the separate and specific condition that the detainee has a weapon or poses some danger.  *Williams*, 731 F.3d at 686 (citing *Terry v. Ohio*, 392 U.S. 1, 17).

Earlier, this Court noted that it is unclear whether the backseat passenger's pat-down began before Watson tossed the gun. Even if, as Watson alleges, the backseat passenger was frisked prior to the tossing of the gun and this constituted a violation of that individual's Fourth Amendment rights, Watson cannot challenge that violation. *See Rakas v. Illinois*, 439 U.S. 128, 128 (1978)("Fourth Amendment rights are personal rights which ... may not be vicariously asserted.")(quoting *Alderman v. United States*, 394 U.S. 165 (1969)); *United States v. Baker*, 719 F.3d 313, 320 (4th Cir. 2013)("This court has repeatedly held that one occupant of a vehicle lacks standing to challenge the frisk or search of another.").

The evidence before the Court shows that Watson was not frisked until after he threw the gun. Once Watson threw the gun, the officers had a good deal more than "some reasonable suspicion" that

Watson was armed and dangerous. Therefore, the Court need not address whether a frisk prior to the throwing of the gun would have also been permissible. The Government has sustained its burden as to the frisk.

CONCLUSION

For the reasons set forth above, this Court finds that Watson's Fourth Amendment rights were not violated,[8] and Defendant's Motion to Suppress Evidence, filed on November 20, 2015 (DE #19) is **DENIED.**

**DATED: September 2, 2016**          **/s/ RUDY LOZANO, Judge**
                                      **United States District Court**

---

[8] Because this Court finds no Fourth Amendment violation, the Government's argument that the violation does not necessitate exclusion of the evidence will not be addressed.